GULOTTA, Judge.
In this stock transfer case, defendant Donald E. Theriot appeals from a judgment in favor of the plaintiff stockbroker, Merrill Lynch, Pierce, Fenner and Smith, Inc., in the sum of $8,046.69. This amount represents the purchase price of 300 shares of Chart House, Inc. stock Merrill Lynch erroneously credited to Theriot’s account in transferring the account to another broker, A. G. Edwards and Sons, Inc.
*414 The thrust of defendant’s appeal is threefold: (1) That plaintiffs suit, filed on November 23, 1976, is based upon a tort claim for unlawful conversion which occurred on March 19, 1975, and which has prescribed since filed more than one year after the unlawful conversion; (2) that plaintiff has failed to establish by a preponderance of the evidence that Theriot’s account was credited with more stock than he actually delivered; and (3) that the trial judge erred •in basing the award on the price of 300 shares of stock Merrill Lynch acquired in June 1976 at a price well in excess of the value of the stock in March 1975, when it was credited to defendant’s account. Finding no merit to any of these contentions, we affirm.
In March 1975, Theriot sold 300 shares of Chart House, Inc. stock through Merrill Lynch, but he had none of this stock in his Merrill Lynch account. To cover the shortage, on March 19, 1975 he delivered to the plaintiff-broker two certificates of stock in Self-Service Restaurants, Inc. (the former name of Chart House, Inc.), each in the amount of 1Ó0 shares. Each Self-Service Restaurants certificate was the equivalent of an equal number of shares of Chart House, Inc. In addition, he delivered 300 shares (represented by 100-share certificates) of Chart House Enterprises stock. The value of one share of Chart House Enterprises stock was the equivalent of one-third share of Chart House, Inc. stock. Although 500 shares of stock were delivered to the plaintiff-broker, their equivalent in stock value amounted to 300 shares of Chart House, Inc. stock. The plaintiff-broker, however, erroneously credited to the client’s account 500 shares of Chart House, Inc. stock. Unknown to either plaintiff or defendant at this stage, Theriot’s account was overcredited with 200 shares of Chart House, Inc. stock.
Sometime thereafter, Theriot transferred his account to A. G. Edwards and Sons, Inc., another stock brokerage firm, and Merrill Lynch erroneously delivered 300 shares of Chart House, Inc. stock to Edwards on November 25, 1975. (Apparently an intervening August 1975 stock split increased the 200-share error to a 300-share error.) In April 1976 Merrill Lynch demanded defendant either return the 300 shares of Chart House, Inc. stock, or else pay it for the stock delivered. Defendant, however, denied he owed the stock to plaintiff. After reiteration of his denial, on June 16, 1976 plaintiff purchased 300 shares of Chart House, Inc. stock to cover the shortage remaining on its books. Of these 300 shares, 298 shares were bought at $26.75 per share, or a total of $7,807.60, including broker’s charges, and two additional shares were later purchased at a total price of $58.37, including broker’s charges. These amounts, plus $199.44 in dividends on the Chart House, Inc: stock transferred to Edwards, reduced by a credit of $18.72, comprise the total amount claimed. The trial judge awarded plaintiff its demand amounting to $8,046.69.
PRESCRIPTION
We reject defendant’s contention that a one-year prescriptive period applied to this transaction. Plaintiff’s claim is not based upon an unlawful conversion of stock by Theriot. It more properly comes within LSA-C.C. art. 2301 et seq.,. relating to “payment of a thing not due.” [1]
Plaintiff’s suit is founded upon defendant’s failure to respond to the demand for the debit balance owing on his account. Thus, the underlying theory is either recovery of a balance owed on an account, pro *415 viding a three-year prescriptive period (LSA-C.C. Art. 3538), or breach of contract, providing for a ten-year prescriptive period (LSA-C.C. Art. 3544.) In any event, it is not based upon a tortious unlawful conversion controlled by a one-year prescriptive period. Accordingly, we conclude the suit was timely filed.
In this connection, when Theriot opened his account with Merrill‘Lynch, he signed a written agreement with plaintiff. The document stated that, in consideration of plaintiff acting as a broker, defendant agreed, among other things, that he would “at all times be liable for the payment of any debit balance owing” in any of his accounts with plaintiff, upon demand. He also agreed to be liable “at all times” for any deficiency remaining in his account. The agreement further established that the securities held by the broker would be security for the payment of any liability owed to the broker in any of defendant’s accounts, and authorized the broker to buy any and all securities which might be short in those accounts.
However, defendant claims the contract was not in existence at the time his account was closed and transferred to Edwards. We reject this contention. The clear meaning of the contract is that the broker is entitled to recover any debit balance owing by the client whether or not the account remained active with the broker. To reach the result claimed by defendant would be to deny recovery to any broker where a mistake or error was made, and would defeat the broker’s right to obtain recovery as contemplated under LSA-C.C. Art. 2301 et seq.
BURDEN OF PROOF
Further, we find no merit to defendant’s claim that plaintiff failed to establish his account was overcredited. Theriot claims this partially because the receipt given him when he delivered the stock certificates states “500” shares of “Self-Service Restaurants, Inc., now Chart House Enterprises.” Obviously the cashier erred, since Self-Service Restaurants actually had become Chart House, Inc. Theriot contends the receipt is vague and either it could represent 500 shares of Self-Service Restaurants (worth an equal number of Chart House, Inc.), or it could represent 500 shares of Chart House Enterprises (worth only Vs as many Chart House, Inc.).
We reject this argument, because the receipt also listed the certificate numbers: LC 6160 & 61 X 100 ea, L5124, 25 & 26 X 100 ea.” Merrill Lynch submitted photocopies of stock certificates bearing these numbers — two 100-share certificates of Self-Service Restaurants and three 100-share certificates of Chart House Enterprises. This evidence supports plaintiff’s version of the transaction.
Further, the positive testimony of Vernon E. Alexander, the operations manager at Merrill Lynch, as well as the exhibits of defendant’s account statements support the transaction as claimed by plaintiff. It is clear the trial judge based his award on this evidence. Alexander’s chronology of the transactions, substantially set forth above, was virtually uncontroverted. Theriot had no independent recollection of the transaction, and stated he had no way of knowing, apart from the records, what occurred in March 1975 regarding the stock transfer. He stated further that, over a period of a year, he probably had 100 different transactions and could not remember any particular delivery of any set of certificates. He did testify, however, that when the account was closed he instructed the account executive at Merrill Lynch that all debts be paid and that all securities held by them be transferred to the new broker, Edwards. He further testified that the original demand from plaintiff was for an overpayment of 96 shares, later increased to 204 shares, and finally up to 297 shares.
Neil Howard, resident manager and vice president of A. G. Edwards and Sons, Inc., added little if anything to cast doubt upon the credibility and plausibility of Alexander’s version of the transaction, upon which the overcredit is claimed. Accordingly, we conclude, as did the trial judge, that plaintiff is entitled to reimbursement of the price for the purchase of 300 shares of Chart House, Inc. stock.
*416 QUANTUM
The more troublesome aspect of this case is the amount of reimbursement to which plaintiff is entitled. The amount of plaintiff’s claim is based Upon a June 16, 1976 purchase of the stock after defendant reiterated his denial that he owed any amount to plaintiff. The question with which we are confronted is whether whether reimbursement for the amount plaintiff paid should be based upon the stock quotations on the date when Merrill Lynch purchased the stock; on the March 1975 date when Merrill Lynch made the overcredit; or on any subsequent determinative dates in between, either when the error was discovered in September 1975 or when the stock was delivered to Edwards in November 1975.
Because we have concluded that plaintiff’s claim is not one in unlawful conversion, we are persuaded that the amount of damages is not assessable on March 19, 1975, the date on which the error occurred. Furthermore, according to Alexander, the price per share on March 14, 1975 was $30.25, well in excess of the $25.75 and $26.75 per share values in June 1976. If we were to take the amount of the damages at the time of the alleged unlawful conversion, as claimed by defendant, this result would operate to Theriot’s detriment.
We see no basis to use the date of discovery of the error (i. e., September 1975) to determine the amount of damages to be assessed. Although plaintiff became aware of the error on that date, apparently defendant was not advised, in writing, of the discrepancy until much later, nor was demand made at that time for return of the 300 shares of stock or for reimbursement of its value. Similarly, we reject defendant’s contention that damages should be assessed at the August 1975 pre-stock split price of $15.00 per share, since the mistake had not yet been discovered nor demand for reimbursement made. Nor are we inclined to base an award on the value of the stock at the time the account was transferred to A. G. Edwards and Sons, Inc., (i. e., November 21,1975), for the same reasons we reject the September 1975 date. Furthermore, if we were to use the date of transferral, defendant would be prejudiced because he wpuld be responsible for an increased amount. The stock on that date was selling at $29.00 per share, while the value and purchase price in June 1976 varied from $25.75 to $26.75 per share.
Furthermore, the contract entered into between plaintiff and defendant provides specifically that the broker is entitled to buy any securities which may be short in the client’s account. Until such time as the client denied plaintiff’s entitlement either to return of the stock or to reimbursement of the stock purchase price, plaintiff was not authorized to purchase any security which may have been short in defendant’s account.
Accordingly, we find no error in the trial court’s assessment of damages based upon the date the replacement stock was purchased by plaintiff. Having so concluded, we affirm the judgment.

AFFIRMED.

. LSA-C.C. Articles 2301, 2302, 2303 and 2304 read as follows:
“Art. 2301. He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he was unduly received it.”
“Art. 2302. He who has paid through mistake, believing himself a debtor, may reclaim what he has paid.”
“Art. 2303. To acquire this right, it is necessary that the thing paid be not due in any manner, either civilly or naturally. A natural obligation to pay will be sufficient to prevent the recovery.”
“Art. 2304. A thing not due is that- which is paid on the supposition of an obligation which did not exist, or from which a person has been released.”